FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2017 OCT 10 PM 3:29

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

John C. Price

Plaintiff

v.

**'17 - CV - 02439**

Jeff Sessions,  Attorney General of the United States

Defendant

## I. Opening statement

1.  This action requests clarification of Article I of the Constitution.  Since the Colorado legislature was unable to redistrict for the House of Representatives following the 1990, 2000, and 2010 censuses, Colorado courts adjudicated the result. In California pursuant to voter approved Propositions 11 and 21 a select committee carried out redistricting in 2011.  In the majority of states (37) state legislatures carried out the 2011 redistricting.  The three approaches have yielded a preponderance of gerrymandered districts with Representatives chosen by the dominant party in these districts.  But the phrase in the Constitution "Members of the House of Representatives, chosen…. by the people of the several states…" should serve as a requirement on House districts, with Plaintiff's proposed districts providing 189 competitive House seats.

## II. Parties

2.  Plaintiff is a registered voter in the Second Congressional District of the state of Colorado, living at 765 10th Street, Boulder Colorado, 80302.
The Attorney General of the United States has the responsibility to ensure that constitutional provisions are enforced and should be notified of a Court decision possibly requiring action.

1

### III.   Jurisdiction and Venue

3.   Jurisdiction of this case is grounded in 28 US Code—Section 1331: The

Federal Question

> The district courts shall have original jurisdiction of all civil actions
> arising under the Constitution, laws, or treaties of the United States.
> The Courts of the United States have jurisdiction to interpret the
> meaning of the Constitution Article I, Sections 2 and 4.
> The Courts of the United States have jurisdiction to interpret the
> meaning of  the Supremacy Clause Article VI, Clause 2.
> This case requires the Court to interpret the "Equal Protection"
> provisions of the Fourteenth Amendment to the Constitution.
> Jurisdiction of this case is grounded in 28 US. Code 1651 – Writs.
> Jurisdiction for this case is grounded in 28 US. Code § 2201  (a)
> Creation of remedy.

4.   Venue of this case is proper under the provisions of 31 U. S. C. 1391

> A civil action may be brought in—
>
> (b) (2) Venue in General
>
> (c) Residency.—For all venue purposes— (1)

5.   U.S. Code Section 703. - Form and venue of proceeding

> The form of proceeding for judicial review is the special statutory
> review proceeding relevant to the subject matter in a court specified by
> statute or, in the absence or inadequacy thereof, any applicable form of
> legal action, including actions for declaratory judgments or writs of
> prohibitory or mandatory injunction or habeas corpus, in a court of
> competent jurisdiction. If no special statutory review proceeding is
> applicable, the action for judicial review may be brought against the
> United States, the agency by its official title, or the appropriate officer.
> Except to the extent that prior, adequate, and exclusive
> opportunity for judicial review is provided by law, agency action is
> subject to judicial review in civil. or criminal proceedings for judicial
> enforcement.

6.   U.S. Code 702 Right of review

> A person suffering legal wrong because of agency action, or
> adversely affected or aggrieved by agency action within the meaning of
> a relevant statute, is entitled to judicial review thereof. An action in a
> court of the United States *seeking* relief other than money damages
> and stating a claim that an agency or an officer or employee thereof
> acted or failed to act in an official capacity or under color of legal
> authority shall not be denied nor relief therein be denied on the
> ground that it is against the United States or that the United States is
> an indispensable party. The United States may be named as a defendant
> in any such action, and a judgment or decree may be entered against
> the United  States: *Provided,* That any mandatory or injunctive
> decree shall specify the Federal officer or officers (by name or by title),
> and their successors in-office, personally responsible for compliance.

Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or implicitly forbids the relief which is sought.

## IV. Basis for This Complaint

7.   A suit requesting a ruling on the constitutionality of voting procedures requires substantial justification.  Plaintiff must demonstrate that:

a)  He is injured by loss of the important property of choice in voting for his member of the House of Representatives.  In Karcher v. Daggett, 462 U.S. 725, (1983), the Court held *In order to challenge a redistricting plan, a party must demonstrate a cognizable injury in fact.*

b)  This injury applies not only to the Plaintiff and others in his district but also for others in Colorado as well as other persons in other states.

c)  That this injury to Plaintiff is a result of a court decision, but also applies to others in a state in which a select committee determined district boundaries, as well as others in states in which the legislature created districts.

d)  That this injury is not universal, i.e. that it does not affect all eligible voters.

e)  That an acceptable solution/remedy is available. United States v. Hays, 515 U.S. 737, 132 L.Ed.2d 635, 115 S.Ct. 2431 (1995).  See also Tucker v. United States Department of Commerce,958 F.2d 1411, 1415 (7th Cir. 1992) (to establish Article III case or controversy in redistricting case, plaintiff must demonstrate some probability of tangible benefit from winning suit).  These requirements are addressed in sections with corresponding capital letters.

## A.  Injury to Plaintiff

8.   The ability to choose one's representation defines the U. S. system of government. The House, Senate and President are elected directly by the People, or through an intermediate body (the electoral college).  Plaintiff claims he is injured as the elections in his House district, Colorado 2, are  essentially guaranteed for the Democratic candidate due to gerrymandering.  The evidence is provided by a list of

3

election results.  But elections are decided by people, who are subject to many conflicting factors that influence their vote.  How can one prove that a set of election results were not caused by unusual circumstances, or even random undescribable factors?  This is the classic problem of statistics, a branch of mathematics dealing only with numbers. It provides means for describing characteristics of a group of numbers in a compact form rather than by enumeration. It finds application through the relation of numerical values to real world phenomena. Thus measurements of height may be used to rank individuals - short to tall. Sales of refrigerators, both number and cost, attendance at sporting events, etc. all may be subjected to statistical analysis.  One number can not be analyzed statistically, but in principle two numbers may provide information about mean and variability.  An important property of statistics is the confidence one may place on any results obtained. A baseball squad with 25 members, the House of Representatives with 435 members, and the number of voters in the United States, of order 200 million, yield highly different confidence levels, which are generally stated in terms of probabilities.  In medicine a 95% confidence level in experimental results is often sufficient for a decision on a drugs effectiveness for human use.  If the numbers have some apparent randomness then the more numbers the better.

9.  Is the voting record of Colorado district 2 different from the others, or similar? In the present case one may compare Colorado district 2 election results with those from other Colorado districts.   Similarly, are Colorado districts representative of others across the entire country? Do we find broad consistency with Colorado 2 if we consider the 50 states?  Finding that a series of elections always support one party candidate and rarely causes change from one party to the other demonstrates that a seat is safe, guaranteed.  One may then ask an underlying question: why?

In considering the U. S. House of Representatives a great simplification is possible because the House is, in practice, a two party body.  There have been only three

4

minority party representatives in the last 50 years
(https://en.wikipedia.org/wiki/Third
party_members_of_the_United_States_House_of_Representatives): Virgil Hamlin
Goode, Jr was first a Democrat, then an independent in 2000, then joined the
Republican Party in 2002.  Bernard Sanders served as an independent from in 1990
to 2007, then joined the Democratic party.  Norman Frederick Lent belonged to the
Republican-Conservative party but served as a Republican member from 1991 to
2003.

The two party system has several practical advantages.  The Gibbard–
Satterthwaite theorem (https://en.wikipedia.org/wiki/Gibbard-
Satterthwaite_theorem) applies to elections that choose a single winner.  It states
that for every voting rule one of the following conclusions must hold:

> 1. The rule is dictatorial, i.e. there exists a distinguished voter who can
> choose the winner

> 2. The rule limits the possible outcomes to two alternatives only; or

> 3. The rule is susceptible to tactical voting: in certain conditions some voter's
sincere ballot may not defend their opinion best.

> 10.   Condition 3 applies both to elections with more than two candidates and
to elections with multi member districts; tactical voting is possible and voters may
select an option that does not best represent their desired outcome.  The simplest
example: when many voters are not satisfied with either principal party's
candidate, they may vote for a very poor third party candidate.  The third party
candidate wins, despite having little real support.  In the U. S. occasionally a third
party candidate is able to draw support from the preferred candidate, preventing
him/her from winning.   Multi member districts and multiparty elections can
prevent any party from achieving a majority, leading to weak and unstable coalition
governments.  The U. S. two party system has functioned well until the last 20-40
years.

### Plaintiff's Lack of Choice

11.   Citizens are affected by the government in many ways: taxes, the need to obey the laws, benefits such as weather forecasts, safe aircraft travel, defense from foreign enemies, etc.  Plaintiff is able to affect the government directly in only two ways: by lawsuit, such as this one, and by voting for government leadership. However, plaintiff 's vote for House of Representatives does not affect the election outcome.  Plaintiff lives in Colorado district 2, whose representative Jared Polis had a victory margin of 19.5% in the most recent election, placing winning beyond the reach of a Republican (or any) opponent(s).  Candidates personalities, campaign, position on issues, backgrounds, etc. rarely affect the election outcome in districts like Colorado 2, although this status is not absolute.  Personal corruption, inflammatory statements, an unusual position on an issue, etc., may lead to the defeat of a candidate in an otherwise safe district.  On rare occasions general public anger translates into a substantial voting shift against an individual or a political party.  Since there is no analytic means to establish that the winner was predetermined, one must assess the issue based on statistical information.  Results for district 2 for the past 24 years (13 elections) are:

12.   Table 1   District 2 voting history

| Year | Democratic Candidate | Republican Candidate | Democratic Victory Margin |
|------|----------------------|----------------------|---------------------------|
| 2016 | Polis | Morse | 19.5 |
| 2014 | Polis | Leing | 13.4 |
| 2012 | Polis | Lundberg | 17.4 |
| The 2011 Redistricting shifted some boundaries | | | |
| 2010 | Polis | Bailey | 19.5 |
| 2008 | Polis | Starin | 28.7 |

6

| 2006 | Udall | Mancuso | 40.0 |
| 2004 | Udall | Hackman | 36.8 |
| 2002 | Udall | Hume | 23.3 |

The 2001 Redistricting shifted some boundaries

| 2000 | Udall | Johnson | 16.4 |
| 1998 | Skaggs | Greenlee | 2.5 |
| 1996 | Skaggs | Miller | 18.7 |
| 1994 | Skaggs | Miller | 10.6 |
| 1992 | Skaggs | Day | 28.1 |

12.    The 2.5% margin in 1998 occurred when Greenlee, the mayor of Boulder, the largest city in the district, ran as a Republican against Skaggs. A simple calculation gives an idea of the probability of Polis losing.  For the 13 numbers the average is 21.15 and the standard deviation is 10.32, so the probability of a negative value, meaning Polis losing, is 2%, or one chance in 50, assuming a normal or bell-shaped distribution. Considering the various candidates and the changes of district boundaries, the assumption for the distribution is not very good, but given the current political situation the result is more likely to overestimate the likelihood of Democratic loss and underestimate the likelihood of loss of an equivalent candidate in a Republican district.  District 2 is a "safe" = guaranteed Democratic district.  The officeholder is selected by the Democratic party, granted that registered Democrats can select their candidate through a caucus or a primary election.

## B.  Lack of Choice for State and National Representatives

### State of Colorado

13.    Plaintiffs' inability to affect the outcome is common to many persons in other Colorado districts.  The competitiveness of seats in the seven Colorado districts may be assessed from Table 2.

Table 2                              Winner's Voting Margins

** Democratic margins in **Boldface**, Republican in *italics*

** U = Unopposed by opposite party

District

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|------|-----|------|------|------|------|------|------|
| 2016 | **39.1** | **19.5** | *13.4* | *32.7* | *31.6* | *9.0* | **14.8** |
| 2014 | **36.8** | **13.4** | *22.3* | *35.5* | *9.6* | *8.9* | **10.2** |
| 2012 | **41.1** | **17.4** | *12.4* | *21.9* | *U* | *3.6* | **12.1** |

2011 Redistricting

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|------|-----|------|------|------|------|------|------|
| 2010 | **38.6** | **19.5** | *4.3* | *11.1* | *36.5* | *34.2* | **11.6** |
| 2008 | **48.1** | **28.7** | **23.2** | *12.4* | *23.0* | *21.4* | **27.0** |
| 2006 | **U** | **40.0** | **25.1** | *2.5* | *19.2* | *18.7* | **12.8** |
| 2004 | **49.2** | **36.8** | **3.9** | *6.2* | *43.6* | *20.5* | *11.9* |
| 2002 | **36.7** | **23.3** | *34.6* | *13.3* | *44.7* | *36.9* | *0.1* |

14. Districts 1, 2, and 7 are safe Democratic, and districts 5 and 6 are safe Republican. Districts 3 and 4 are probably safe Republican, but the 2011 redistricting and swings in national party support prevent calling these districts "safe". When the pre election difference between two candidates is small the race is even, a tossup. As the pre-election difference increases the likelihood decreases that the candidate of the lesser party will win.

### The 50 States

15. The New York Times has published House election results for the 2008 to 2016 elections. They show that only 7% of House races resulted in a party change from one election to the next. Most changes of incumbency lead to replacement by another member of the same party.

8

The Times also predicted election results, splitting races into three categories: expected to win easily, expected to win narrowly, and tossups. Since the elections yielded similar information plaintiff added the five results to improve statistical significance. Of the "win easily" seats, two of 1795 races changed party. Only 20 of the 243 "win narrowly" seats changed party, suggesting these could be labeled "almost certain". The tossups split 60 Democratic, 75 Republican. The total = 2 +20 + 135 = 157 is 7% of the total contests. Voters voted, but the winners were already decided in almost all races.

The Time's listing of winners' margins validates the rule of thumb – victory margin greater than 10% guarantees election, 5-10% is slightly competitive, less than 5% is competitive. For a predicted margin greater than 10% the lesser party candidate has very little chance of winning.

16. One party or the other dominates consistently in most districts in the state of Colorado, in 93% of the House elections, and in the Plaintiff's district. Condition B is satisfied.

### C. Source of injury

#### 1. The courts

Because the Colorado legislature did not successfully redistrict in 1991, 2001, or 2011 districts resulted from lawsuits adjudicated by Colorado courts.

17. 2011 redistricting

Although the 2011 General Assembly introduced several congressional redistricting maps, none of the plans were enacted. The Denver district court accepted a plan proposed by Hall and Moreno (District Court 11CV3461 and 11CV 3463, 2011) and affirmed by the Colorado Supreme Court (11SC842, 2012 CO 14).

18. 2001 redistricting

The Colorado Legislature failed to enact a redistricting plan in its 2001 regular session and in early 2002, the state court adopted an amended version of the plan submitted by the Republican Leadership. (*In re Reapportionment of the Colorado*

9

*General Assembly*, No. 01SA386, 45 P.3d 1237 (Colo. Feb. 22, 2002), (*Lance v.*

*Coffman*, No. 06-641 (U.S. Mar. 5, 2007) ) *(per curiam)*

In 2007 the U.S. Supreme Court affirmed a challenge to the state court's decision.

The citizen-plaintiffs had only shown an "undifferentiated, generalized grievance

about the conduct of government" that allegedly failed to follow the Elections

Clause. This grievance was common to all members of the public. Plaintiffs had

failed to show a "particularized stake in the litigation" that was peculiar to

themselves.

   19.   1991 redistricting

After a congressional redistricting plan was enacted and vetoed in the fall of 1991,

and a  second plan was enacted and vetoed during the 1992 regular session, the

court appointed a special master and a third plan was enacted.

http://www.senate.mn/departments/scr/REDIST/Redsum/cosum.htm#828%20P.2d

%20185

Martinez v. Romer, Civ. Nos. 91-C-1972, 91-C-2129, and 91-C-2162 (D. Colo.) (no

published opinion)

https://www.colorado.gov/pacific/cga-redistrict/proposed-congressional-maps   2001

redistricting [7]

http://www.ncsl.org/research/redistricting/2000s-redistricting-case-

summaries.aspx#CO

Avalos v. Davidson, No. 01 CV 2897 (Dist. Ct. Denver Co. Jan. 25, 2002), aff'd sub

nom. Beauprez v. Avalos, No. 02SC87, 42 P.3d 642 (Colo. Mar. 13, 2002) (en banc)

Though consistent with Colorado judicial rulings, plaintiff's district is dominated

by Democratic voters, resulting in representatives selected by the party.

   2. **Districting by a Select Committee**

   20.   The lack of choice has resulted from a select committee in California. In

2008 California voters approved a committee to carry out 2011 redistricting for

state legislative districts.

(https://ballotpedia.org/California_Proposition_11,_Creation_of_the_California_Citiz
ens_Redistricting_Commission_(2008))

> Proposition 11 changed the process that is undertaken once every ten
> years of setting (which sometimes means re-drawing) the geographic
> boundaries of the state's legislative districts and Board of Equalization
> districts.... That task was given to a new, 14-member commission.

In 2010 voters added federal congressional districts to the responsibility of the

commission through California Proposition 20.

(https://ballotpedia.org/California_Proposition_20,_Congressional_Redistricti

ng_)

In California there was an expectation that the committee would assure a number

of competitive races, which had been notably absent.

> California's redistricting process of 2011-2012, conducted by the
> California Citizens Redistricting Commission, has been held up by
> many as a redistricting ideal. It is easy to see why. In a redistricting
> cycle that was largely dominated by partisan lawmakers, self-
> interested incumbents, and protracted legal battles, California's
> redistricting stood out as one of the few truly nonpartisan, independent
> processes.

Thus the outlook was positive for competitive races.  A New York Times quote
illustrates:

(http://www.nytimes.com/2012/02/14/us/california-congressional-delegation-braces-
for-change.html?_r=0 [12])

>  California's Congressional delegation, the largest and most influential
> in the nation, is undergoing a major upheaval, the result of
> reapportionment and retirements, threatening the state's influence in
> Washington next year and forcing members to scramble to withstand
> what is emerging as a generational wave..... Only one seat changed
> hands between parties in the course of 255 Congressional elections in
> California over the past 10 years.

By 2016 the hopes were dashed.  (https://www.washingtonpost.com/news/the-

fix/wp/2016/12/01/californiajust-proved-that-redistricting-reform-isnt-all-its-

cracked-up-to-be/?utm_term=.c9f6393fc574)

> ....... For the fourth time in 12 years, <u>not a single one</u> of the state's 50-
> plus congressional districts switched parties. Just as in 2010, 2008 and
> 2004, every single seat returned to the party that previously controlled
> it.
> But in the end, California might be Exhibit A in the limits of
> redistricting reform's impact on competition.  California's districts were

actually drawn irrespective of competitiveness and partisanship. The commission decided not to even look at competitive districts when drawing its districts, preferring to focus on what it called "communities of interest" and other demographics. Paul Mitchell, a Democratic redistricting expert, said "When you draw lines to keep communities of interest together, you wind up creating districts that, by proxy, are partisan — as partisan as if you drew them with party labels — because you're drawing them with values that are definitive of partisan labels themselves."

The California example shows that redistricting by a special committee does not necessarily lead to choice for voters.

### 3. Legislature (https://ballotpedia.org/State-by-state_redistricting_procedures)

21.   As of June 2017, the legislatures themselves were responsible for state legislative redistricting in 37 states. In six states, the task fell to independent commissions. In seven states, politician commissions drew state legislative district maps.  All three methods can be unable or unwilling to provide choice to substantial numbers of voters, as demonstrated in section A.  They have lacked an objective criterion specifying choice in the redistricting process, leaving factors such as compactness, communities of interest, social factors, race, etc. which are applied arbitrarily during redistricting.   Currently there is no formalism in law describing a "proper" or "fair" redistricting.

Condition C is satisfied.   However, a question remains: have the People of the United States sorted themselves geographically by party such that few competitive districts are possible?

### D. State of the art in redistricting and a Colorado solution

22.   It is easy to create districts in a state by drawing lines on a map. A district typically has 400 to 500 voter districts, abbreviated VTDs by the Census Bureau, each having a population of a few thousand.  Colorado, with 7 House districts, has 3250 VTDs. With a map showing VDT populations, one person can call out a VTD population while a second person enters it on a calculator.  If the

map does not show the population values then the first person looks up the name or VTD index in a table and passes the population figure to the second. If the population in the originally drawn area is not close enough to the required result ( "one man, one vote") then VTDs may be added or deleted from the proposed district to satisfy the population requirement. This is a slow and laborious process, but manageable.

23. However, once an additional requirement is placed on hand drawn districts, the problem becomes much more difficult. Considering relative values of the political parties or minority populations adds another variable that must be accumulated along with the population total. Importantly, this second map must have the second variable in coded form, either colored or gray scale, so that a visual recognition of relative party strength can assist the choice of a VTD to add or subtract from the running totals of population and the second variable. Deciding which VTDs to add or delete to serve two goals is beyond the practical capability of most people unless a computer with a map display is used. Advances in computer hardware and software during the last two decades allow rapid and efficient construction of districts of equal population as well as furthering the states secondary goals (Karcher v. Daggett, 462 U.S. 725 (1983). When finished the constructed district satisfies both the population and the secondary criteria, be it a partisan gerrymander with districts separated by party, or fractional minority representation, or equal numbers of Republican and Democratic voters. The separation of state populations into Republican and Democratic districts allows the dominant party in a state legislature, or the courts, or a committee, to create an advantage for itself in the federal House. The parties provide very little public information about the details of implementing this process.

(https://en.wikipedia.org/wiki/Gerrymandering  see Section on Transparency)

> When a single political party controls both legislative houses of a state during redistricting, both Democrats and Republicans have displayed a marked propensity for couching the process in secrecy; in May 2010, for

example, the Republican National Committee held a redistricting training session in Ohio where the theme was "Keep it Secret, Keep it Safe". The need for increased transparency in redistricting processes is clear; a 2012 investigation by The Center for Public Integrity reviewed every state's redistricting processes for both transparency and potential for public input, and ultimately assigned 24 states grades of either D or F.

24.   A description is contained in the book (Daley, David (Ratf**ked (sic): The True Story Behind the Secret Plan to Steal America's Democracy, 2016). For outsiders (not involved in the details) there is an additional unmentioned complication: obtaining VTD level data on election results.  The U. S. decennial census provides total and minority population values. Federal government election results are available as totals for each candidate in each race, but there is no fine resolution VTD data base of party votes.  Detailed voting district data are often available only at the county level.  Since the nation has over 3,000 counties it is very difficult to create a nationwide data base suitable for analyzing the possibilities for districts.  The Democrats have Demzilla (https://en.wikipedia.org/wiki/Demzilla), (https://www.informationweek.com/democrats-unleash-demzilla-on-the-gop-/d/d-id/1026965), the Republicans have Voter Vault (https://en.wikipedia.org/wiki/Voter_Vault) , but these are compilations of individual voter names, donations, economic data, etc.  There is little specific information to be found on voting records.

### Is a Practical Solution Possible?

25.   David Bradlee (http://gardow.com/davebradlee/default.html) has developed a public domain computer program, Davesredistricting (http://gardow.com/davebradlee/redistricting/launchapp.html), that allows anyone with online access to construct House districts.  Bradlee's program incorporates shape files of district geography, and  national election data plus census files of population.  A single individual, Steven Gerontakis, University of North Carolina at Asheville,  has prepared voluminous data for VTDs for 45 of the 50 states, and

14

others have contributed data for the remaining five. Plaintiff has used this program and associated data to create districts which are free of partisan bias. Plaintiff interprets Article I of the Constitution as requiring choice for as many districts as possible with approximately equal numbers of predicted voters in the major parties. This is not a simple task so Plaintiff adopts the word *balanced* in order to emphasize that judgment and effort are required. The Constitution does not require exact balance, but current experience of gerrymandering demonstrates that the dominant party in state legislatures will construct a numerical voter advantage in House districts if allowed to do so. This acceptable party difference must be established empirically. In practice a 1% limit on the ratio (party voter difference)/ (total votes) is appropriate, i.e. much smaller than errors in knowledge of voter preference, but achievable with some effort.

### A Proposed Solution for Colorado

26. Using Davesredistricting program Plaintiff has created five Colorado districts within the 1% limit for party differences. Exhibit 1 shows illustrates plaintiff's both desired districts as well as the values of party strength in map form, a table with the respective party votes and differences, and a first of 68 pages of the district assignment list. Plaintiff resides in district 1, which is blue in the image. Differences between parties for these districts are shown below by increasing value.

Plaintiff's districts   0.1%,   0.1%,   0.3%,   0.6%,   0.8%,   17.5%,   49.1%.

The first five districts, representing 57% of the population, are tossups, as opposed to none with the present 2016 districts shown below, with party difference again listed in increasing magnitude:

9.0%,   13.4%,   14.8%,   19.5%,   31.6%,   32.7%,   39.1%.

Plaintiff and voters in four other Colorado districts can have choice with the desired districts, as opposed to the present districts.

### E. Remedy Not Available to All

27.   Is Colorado unique or are balanced districts generally possible?  Plaintiff has used Dave's Redistricting in the 50 states, finding 189 balanced districts. See exhibit 2.   Currently the typical number of competitive districts is currently about 30 to 35. Astonishing!  The  gerrymander people are really good at it.  With 30 additional  balanced districts winners would represent a majority in the House. Evidently 189/435 = 43% of the population can have a choice for representative, Plaintiff among them.  Thus Plaintiff  would be  neither a member of a small minority nor a member of a universal majority and Condition E is satisfied. Plaintiff has met requirements A-E for standing and jurisdiction.

## IV  Background of  This Civil Action

28.   Although some delegates at the Constitutional Convention were labeled federalist or anti-federalist, at that time there were no political parties, which originated during the presidency of George Washington.  As the Constitutional Convention ended, a Mrs. Powell of Philadelphia asked Benjamin Franklin, "Well, Doctor, what have we got, a republic or a monarchy?" Without hesitation Franklin responded, "A republic, if you can keep it."  The Convention did not name a type of government, which might have been subject to interpretation, nor did it say "elected by the People", probably because some might be interpret this as voting rather than choosing, although in dictionaries elect means choose. The Constitution made it clear by an operational definition – *members … chosen by the People*.  Not foreseeing political parties, the Convention left to state legislatures the selection procedures for federal Senators and Representatives.

At the time of the Convention the country was relatively primitive.  Creating districts was a laborious task accomplished by drawing boundaries on maps, then distributing these boundary charts to polling places.  After the 1810 census, knowledge of the distribution of population and political sentiments enabled the dominant party in the Massachusetts legislature to redistrict in favor of its own

16

party in the Massachusetts senate, thus: the gerrymander named after Governor Gerry.

Meanwhile technology and science advanced, producing (in the approximate year of widespread use) the locomotive (1830), telegraph (1840), typewriter (1870), electric power (1880), automobile (1920), and the electronic computer (1960). From time to time state legislatures could not reach agreement on federal Senators, resulting in a vacancy. The 17th amendment (1913) ended state legislative authority and replaced it with election by the People. For the past 150 years either the Republican or Democratic Party has controlled the federal government, with minor parties having slight importance from time to time. But usable computer programs for combining maps, population figures and voter preferences to support gerrymandering are very recent. Since the Constitution mentions neither political parties nor a geographic partitioning procedure, courts have lacked guidance in gerrymandering suits and allow it to continue. Today the dominant party in state legislatures creates partisan districts to its party's maximum advantage in the federal House. Separation of powers between the judicial and legislative branches and lack of clear criteria have prevented the courts from establishing a specific basis for limiting gerrymandering. (Vieth v. Jubelirer, 541 US 267 - Supreme Court 2004)

### V. The Question: Plaintiff's Argument

29.   To quote from the recent web site of the Brennan Center for Justice:

> Today, few congressional districts are competitive. Through the once-a-decade redistricting process, voters don't choose lawmakers — lawmakers routinely choose voters. Drawn by partisan legislatures, most districts now are truly one-party fiefdoms.

Plaintiff believes and asserts that Article I Section 2, ....*composed of members chosen every second year by the People of the several States, ....,* places a constraint on Article I Section 4, ....*Manner of holding Elections for Senators and Representative.....*

Holding Elections, in Section 4? The word must refer to the word *chosen* in Section 2. But the word choice requires careful consideration.

### The Word "Choice"

30.  1. Henry Ford (1863-1947) wrote that he commented at a meeting with sales people in 1909 "A customer can have a car painted any color he wants as long as it's black".  History does not record the reaction of the sales force, but they may have felt that Ford had a valid reason for making the choice.  He did - black paint absorbs all color radiation, thus making it dry faster.  This is important in an assembly line where the time delay while paint dries is a consideration.  In any case, we recognize that the purchaser in fact did not have a choice.

31.  2. China    (https://en.wikipedia.org/wiki/Elections_in_China)

> Although there is no legal requirement for either membership in or approval by the Communist Party of China (CPC), the membership of the higher people's congresses and people's governments are largely determined by the Party.  Independent candidates are strongly discouraged and face government intervention in their campaigns.  In practice, the power of parties other than the Communist Party of China is eliminated.

One may say that the Chinese people have a choice, but a limited choice.

32.  3. Iran

(https://en.wikipedia.org/wiki/Iranian_presidential_election,_2017)

> Any Iranian citizen above 18 years of age was able to register as a presidential candidate. An institution called the Election Monitoring Agency (EMA) and managed by the Guardian Council vets registered candidates and approves a handful to run in the election. Women who register as candidates have invariably been excluded from standing for election by the Council.

Once again the people have a choice, but a limited choice.

33.  4. Voting rights act    H.R. 9 (109th): Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006

> (a) Purpose - The purpose of this Act is to ensure that the right of all citizens to vote, including the right to register to vote and cast meaningful votes, is preserved and protected as guaranteed by the Constitution.

It would seem that the word "meaningful" signifies that the voter has a reasonable possibility of affecting the outcome of elections.  But the word is not used in the

18

document. So in practice the act and its successive amendments guarantee only the right to vote.

34. 5. The Constitution specifies qualifications for voters for the federal house: any elector for the lower house of the state legislature. Changes in eligibility and disputes concerning voter qualifications have not affected the principle that *any* elector may vote for a member of the House of Representatives. This represents the right to vote for all those eligible. But do the People *choose* when the House members are known in advance, namely, those chosen by one or the other party?

35. 6. If the phrase *chosen by the people* has no force in law, then why is it included in the body of the Constitution? It should properly be stated as a goal, as in the Preamble.

> ….…..in Order to form a more perfect Union, establish Justice, allow the People to choose their governing officers, insure domestic Tranquility, provide for the common defense, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity,….

Instead the Constitutional Convention stated its position in the second sentence of the constitution with an "in your face" answer, as Franklin replied to Mrs. Patton.

### A Solution

Plaintiff recognizes that a solution is difficult because of requirements a - e.

36. 1. It also requires a well designed computer program such that a computer user can create balanced House districts. Credit David Bradlee.

2. The program requires national election data in a proper format. There is no data base of this type publicly available. Acquisition and manipulation of the data to match the program of #1 is a challenging task. Credit Steven Gerontakis.

3. It requires a person using #1 and #2 to construct a legal brief advocating this solution. *And the motivation.* Members of the political parties have had this capability for many (30?) years. But they have spurned it in favor of gaining political advantage over the other party, as described in Daley, ibid.

### Alternatives

37.     Suppose that the justice system accepts that choice/competitiveness is needed in redistricting but a relationship between Section 2 and section 4 does not exist because the Constitution does not explicitly specify one. Other alternatives are possible:

1.   Congress can enact a law specifying "Creation of House districts requires that a maximum number of districts provide competitiveness as represented by approximate equality between the major party voter strengths."

2.   Individual states may pass this same law, though some may not, thus opening the possibility of federal suits in such states (Equal Protection).

3.   Voters in various states may enact a proposition equivalent to #1 above.

The first two are unlikely because the two parties share the benefit of the existing condition:  guaranteed reelection for incumbents or their party selected replacements.  The third is unlikely because there is no recognizable organization for creating such a law in the face of the parties' opposition.  Unlike the California propositions this would  address competitiveness instead of passing the decision to a committee or equivalent intermediary between the People and the end result.

4. A constitutional amendment is possible.  One must consider that the present situation provides certain election of one or the other of the major parties in almost all districts.  Each district's voters are happy, but the result when House members assemble in Washington is a partisan battleground  with each member supported by a strong majority back home.  There is an historical analogy. The conflict between the geographically separated North and South ultimately led to the Civil War.  One hundred years later the principle "separate but equal" led to a similar conflict that was settled without bloodshed but much rancor. The racial divide was recognized in the Constitutional Convention and was settled there.  The antagonists met face to face, but there was no party structure to inflame the

conflict. Plaintiff does not take any of the above alternatives seriously. Either the Constitution specifies a connection between Sections 2 and 4 or the struggle in the legislature will continue.

     5. Article I Section 4 begins ….*Manner of holding Elections for Senators and Representative*….. but, as indicated previously, reference to elections is not clear. Therefore states are free to interpret it as elections for their own legislatures, rather than the federal House. Likewise, they may adopt the policy of the presidential winner take all in the state legislature, so the dominant party could select all its federal House members. Plaintiff regards this absurdity as evidence that Article I Sections2 and 4 are bound together, so that voter choice is demanded in the redistricting process.

    38. There is a complication. Gerrymanders can reduce or eliminate the ability of minorities to elect House members. There are two approaches: a) packing, i.e. creating districts that are strongly dominated by the minority so that they receive fewer House members than is possible, and 2) cracking, in which minority voters are split among districts giving them no chance of electing a representatives in such districts. The approach described here may lead to racial or ethnic disparities among the districts. Nothing in plaintiff's request is discriminatory; the sole consideration is providing voter choice by requiring "balancing" in the redistricting process. The racial issue has been addressed in terms of intent. (Arlington Heights v. Metropolitan Housing Development Corp. 429 U.S. 252 (1977))

      "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Disparate impact merely has an evidentiary value; absent a "stark" pattern, "impact alone is not determinative."

    39. Plaintiff's approach seeks to provide maximum choice to the People. It also suggests a plausible numerical criterion for addressing racial/ethnic issues:

when a potential balanced district must be altered, with resultant loss of balance, in order to provide choice to a minority, courts should compare the numerical loss of voter choice with the number gained by minority voters.  The increase in choice of the minority voters should exceed the loss by others.

40.   The defendant is being sued as the representative of the Justice Department who will be responsible for enforcement.  Failure of prior enforcement may be due to absence of a claim.

## VI.  PRAYERS FOR RELIEF

41.   WHEREFORE, Plaintiff prays for the following relief:

A DECLARATION that voter choice takes precedence among criteria for redistricting for the House of Representatives.

A DECLARATION that the U. S. Constitution and federal law take precedence over state law in the redistricting process.

A DECLARATION that the plaintiff's redistricting exemplified in Exhibit 2 replace the current districts.

A DECLARATION that changes of voter district boundaries are subject to court review because increase in population of VTDs or unusual shapes could restrict construction of balanced districts.  Florida has VTDs  with populations as large as 9500, or more than 1% of that in a House district.  Vote reporting must be continued for the present size VTD populations, even if other aspects are combined (polling places, tabulation locations, etc).  A limit of 4,000 is recommended, with unusual geometries forbidden., and current sizes grandfathered in until the next redistricting.

## VI.  Further Considerations

42.   A number of assumptions have not been addressed because they have no bearing on the Constitutional question.  This suit's recommendation is an initial solution of several problems that need additional study.  Some of these questions will require more data in satisfactory form, or more literally, in satisfactory

computer format. Plaintiff has been unable to find an archive of complete VTD data (population, party strength, geographic boundaries) except for the one in the DavesRedistricting program. This program contains the "how" of redistricting in a compact methodology simple enough to be taught to a moderately competent computer user in an afternoon. It contains a structure for creating districts at any scale (county, state legislative, federal legislative) provided input data are available. A problem arises in incorporating the spatial distribution of the two dominant parties for a particular purpose, be it gerrymandering, or creating "balanced" districts, or whatever. How does one quantify Republican and Democratic voters in each VTD? A better representation might be obtained from examination of state legislature elections except for two defects: 1) They depend on the local candidates and issues, and 2) Many election results are corrupted by the gerrymandering of the districts.

43. Voter registration information is not adequate because only fractions of registered voters actually vote. Some people register in the party opposite to one's views. Party membership provides only a general indication. The best information on proportions of voters comes from elections. There is only one election that is nationwide, a presidential election. Which one? The most recent would seem appropriate. But a nationwide compilation of VTD data does not exist for either 2012 or 2016. The voter districts and census data have only been combined suitably for the 2008 presidential election, the year used by DavesRedistricting. In that year Obama defeated McCain by 7% nationwide. The 2008 election data probably exaggerates the number of consistent Democratic voters versus Republican. This would be unsuitable for a 10 year projection seeking to provide balanced districts. However the pendulum of public opinion appears to be moving to the left, i.e. Democratic strength. So for the 2018 and 2020 elections the 2008 presidential record of relative voter strength is satisfactory.

44.   Research is needed to estimate party voters more accurately. Possibilities include results from the more recent presidential elections, or the Cook partisan voting index, which averages results of the previous two presidential elections. Any one House election is subject to undue effect in case of a highly unequal party vote for president. The next redistricting will use 2020 census data. Off hand a 3,2,1 weighting of presidential elections seems reasonable, i.e. weight of 3 for the most recent election, 2 for that 4 years earlier, 1 for the election 8 years previous.  For the future the principal goal should be transparency.  The basis for judgments must be visible to all.

Legal discussions and trials concerning redistricting are couched in the terms compact, contiguous, communities of interest, suburban, urban, rural, education, etc.  The predictive power of these labels for party votes is poor, although some broad generalizations can be drawn.  Gelman, Andrew (Red State  Blue State Rich State Poor State, 2009) presents many graphs and tables.  Socioeconomic data could be used to predict voter preferences through techniques such as multiple regression or principal components but these are likely to produce unstable/unreliable estimates.  Presumably the parties collect voting results and use maps of them to implement gerrymandering, but Plaintiff has never seen this acknowledged. Only the euphemisms, especially 'communities of interest', are used in legal discussions.

45.   Ignoring political boundaries does not create problems.  Irregular shapes are accommodated by existing technology, as is demonstrated by current Pennsylvania district 17 (exhibit 3).  Plaintiff suggests that VTD data from federal elections be maintained at the federal level for use in redistricting.  These should be saved in a secure place and common format.  Election irregularities are more likely with increasing reliance on technology.

Evidence of tampering with elections will diminish public confidence in the process. Fraudulent ballots are unlikely because thousands are needed to have an effect and stuffing ballot boxes is possible but unlikely.  However electronic manipulation may

24

not be detected unless baseline (historical) voting patterns are available for comparison. There are none.

46.   Finally, Plaintiff's recommended action can largely eliminate virtually all state's ability to affect redistricting if strict requirements for choice are enforced. It is worth noting that solutions having a maximum number of districts with choice may not be unique. At least two rather different configurations are available for Colorado. Slight shifting of borders is often possible while obeying the 1% difference rule. However substantial change may be indicated in a decadal redistricting, with impact on incumbents. In a sense, many districts are fragile as any significant border change places them outside the 1% balance requirement. The standard may be relaxed to protect an incumbent from sure defeat, e.g. a single balanced district may be broken for a state with 5 to15 House members, two for a state with 16 to 26 members, one for each party, and three for more than 26 members: California, Texas, Florida and New York. These are only suggestions. Balancing frequently means creating districts with rural areas joined with sections of cities. Plaintiff's experience suggests that the number of "spokes on the wheel" should not be greater than 6 in order to avoid extreme geometries.

47.   Should state legislatures and other political entities be subject to the constraint? Plaintiff believes they should, if the state constitution or laws call for *choice* or for *election*. It is true that lower governments generally have election districts with smaller populations. It is reasonable that districts with smaller populations should have less stringent the balance requirements.
Inspection shows that Plaintiff's recommended districts sometimes produce a solid core, usually in a Democratic city, where voter choice has been lost. This may be regarded as analogous to the founders' creation of the federal Senate in order to prevent  legislative dominance by larger population states.

John C. Price
765 10th Street
Boulder CO 80302
303-939-9991

25

**Exhibits**

Exhibit 1

a) Image of Plaintiff defined Colorado districts with five balanced, two probable Democratic.  Plaintiff lives in District 1, which is blue.

b) Image of Colorado relative voter strength in the 2008 presidential election, as indicated by colors - dark blue strongly Democratic to dark orange strongly Republican.

c) Votes, party percentages and party difference for Plaintiffs Colorado districts.

d) The first of 68 pages of Colorado VTD assignments to districts.

Exhibit 2

A state list of current apportionment and the number of balanced districts for the U. S.  The elements of Exhibit 1 could be extended with similar files for each state, but the Davesredistrcting files xxxx.drf contains all this information as well as the high resolution image of the districts and VTDs.  The .drf files for the 50 states easily fit on a single thumb drive, a small, aptly named device.  A copy of these files may be provided with a brief explanation of the method for extracting 1c) and 1d) above from the .drf files.  Images such as 1a) and 1d) above lack detail, particularly for geographically large states and the computer program Davesredistricting must by used to access the detail.

Exhibit 3

An example of an "unusual" shape district in Pennsylvania.

Exhibit 1 a

## Colorado Districts



**Exhibit 1 b**

# Colorado Parties

### Republican Orange, Democratic Blue



# Exhibit 1c

| District | Total Population | Pres08 Total Vote | Pres08 Democratic | Pres08 Republican | Dem Percent | Rep Percent | Rep-Dem |
|---|---|---|---|---|---|---|---|
| 1 | 718692 | 353493 | 174407 | 173280 | 49.34% | 49.02% | -0.32% |
| 2 | 719258 | 391733 | 192767 | 193089 | 49.21% | 49.29% | 0.08% |
| 3 | 718607 | 312616 | 230956 | 76498 | 73.88% | 24.47% | -49.41% |
| 4 | 717940 | 370135 | 182973 | 180855 | 49.43% | 48.86% | -0.57% |
| 5 | 717804 | 313803 | 154052 | 154289 | 49.09% | 49.17% | 0.08% |
| 6 | 717442 | 344127 | 199097 | 138903 | 57.86% | 40.36% | -17.49% |
| 7 | 719453 | 315337 | 154175 | 156703 | 48.89% | 49.69% | 0.80% |

## Exhibit 1d

| GeoID2 | District | Name | County | Total Popula | Pres08 Total | Pres08 Dem | Pres08 Rep |
|---|---|---|---|---|---|---|---|
| 800101108 | 7 | Adams 108 | Adams | 1354 | 250 | 148 | 90 |
| 800101109 | 7 | Adams 109 | Adams | 2936 | 515 | 300 | 193 |
| 800101098 | 6 | Adams 98 | Adams | 3135 | 1117 | 666 | 431 |
| 800101037 | 6 | Adams 37 | Adams | 1637 | 1035 | 549 | 477 |
| 800101110 | 7 | Adams 110 | Adams | 4025 | 881 | 629 | 241 |
| 800101111 | 3 | Adams 111 | Adams | 2091 | 473 | 336 | 125 |
| 800101113 | 3 | Adams 113 | Adams | 2819 | 683 | 473 | 188 |
| 800101077 | 6 | Adams 77 | Adams | 2794 | 1388 | 807 | 561 |
| 800101184 | 1 | Adams 184 | Adams | 255 | 187 | 89 | 92 |
| 800101117 | 3 | Adams 117 | Adams | 3763 | 746 | 528 | 203 |
| 800101207 | 1 | Adams 207 | Adams | 222 | 102 | 23 | 77 |
| 800101204 | 1 | Adams 204 | Adams | 246 | 123 | 29 | 90 |
| 800101203 | 1 | Adams 203 | Adams | 163 | 69 | 26 | 43 |
| 800101202 | 1 | Adams 202 | Adams | 779 | 371 | 122 | 235 |
| 800101209 | 1 | Adams 209 | Adams | 1203 | 471 | 153 | 302 |
| 800101188 | 1 | Adams 188 | Adams | 1895 | 1063 | 380 | 670 |
| 800101101 | 7 | Adams 101 | Adams | 2238 | 795 | 449 | 338 |
| 800101036 | 6 | Adams 36 | Adams | 1434 | 931 | 499 | 417 |
| 800101116 | 3 | Adams 116 | Adams | 3157 | 712 | 495 | 199 |
| 800101118 | 3 | Adams 118 | Adams | 3893 | 798 | 599 | 176 |
| 800101004 | 3 | Adams 4 | Adams | 459 | 156 | 93 | 57 |
| 800101114 | 3 | Adams 114 | Adams | 2710 | 662 | 450 | 195 |
| 800101035 | 6 | Adams 35 | Adams | 2826 | 1396 | 891 | 486 |
| 800101129 | 6 | Adams 129 | Adams | 2700 | 1335 | 751 | 552 |
| 800101169 | 6 | Adams 169 | Adams | 730 | 401 | 180 | 212 |
| 800101182 | 1 | Adams 182 | Adams | 2320 | 859 | 423 | 425 |
| 800101186 | 1 | Adams 186 | Adams | 2776 | 1195 | 559 | 620 |
| 800101187 | 1 | Adams 187 | Adams | 848 | 330 | 171 | 155 |
| 800101183 | 1 | Adams 183 | Adams | 2761 | 1264 | 596 | 657 |
| 800101181 | 1 | Adams 181 | Adams | 1211 | 617 | 280 | 325 |
| 800101071 | 6 | Adams 71 | Adams | 2372 | 1218 | 638 | 571 |
| 800101070 | 6 | Adams 70 | Adams | 1713 | 856 | 440 | 403 |
| 800101040 | 6 | Adams 40 | Adams | 1659 | 987 | 485 | 478 |
| 800101038 | 6 | Adams 38 | Adams | 2119 | 1289 | 709 | 564 |
| 800101034 | 6 | Adams 34 | Adams | 2761 | 1646 | 847 | 775 |
| 800101073 | 6 | Adams 73 | Adams | 964 | 579 | 283 | 292 |
| 800101076 | 6 | Adams 76 | Adams | 1699 | 606 | 340 | 254 |
| 800101136 | 6 | Adams 136 | Adams | 2154 | 581 | 391 | 181 |
| 800101180 | 1 | Adams 180 | Adams | 2698 | 813 | 403 | 386 |
| 800101178 | 1 | Adams 178 | Adams | 1204 | 570 | 260 | 295 |
| 800101177 | 1 | Adams 177 | Adams | 1090 | 690 | 307 | 375 |
| 800101176 | 1 | Adams 176 | Adams | 1172 | 544 | 273 | 264 |
| 800101173 | 1 | Adams 173 | Adams | 2907 | 944 | 533 | 389 |
| 800101162 | 6 | Adams 162 | Adams | 1285 | 521 | 235 | 279 |
| 800101161 | 6 | Adams 161 | Adams | 1977 | 1002 | 474 | 512 |

# Exhibit 2

| State | House seats | Balanced | State | House seats | Balanced |
|-------|-------------|----------|-------|-------------|----------|
| | at large | | | | |
| Alaska | 1 | 0 | Kansas | 4 | 2 |
| Delaware | 1 | 0 | Kentucky | 6 | 2 |
| Montana | 1 | 0 | Louisiana | 6 | 2 |
| North Dakota | 1 | 0 | Maine | 2 | 1 |
| South Dakota | 1 | 0 | Maryland | 8 | 4 |
| Vermont | 1 | 0 | Michigan | 14 | 5 |
| Wyoming | 1 | 0 | Minnesota | 8 | 4 |
| | | | Mississippi | 4 | 2 |
| | one party | | Missouri | 8 | 6 |
| Connecticut | 5 | 0 | Nebraska | 3 | 1 |
| Hawaii | 2 | 0 | Nevada | 4 | 1 |
| Idaho | 2 | 0 | NewHampshire | 2 | 1 |
| Massachusetts | 9 | 0 | New Jersey | 12 | 6 |
| Oklahoma | 5 | 0 | New Mexico | 3 | 1 |
| Rhode Island | 2 | 0 | New York | 27 | 8 |
| West Virginia | 3 | 0 | North Carolina | 13 | 10 |
| | two party | | Ohio | 16 | 10 |
| Alabama | 7 | 2 | Oregon | 5 | 2 |
| Arizona | 9 | 5 | Pennsylvania | 18 | 9 |
| Arkansas | 4 | 1 | South Carolina | 7 | 4 |
| California | 53 | 19 | Tennessee | 9 | 4 |
| Colorado | 7 | 5 | Texas | 36 | 22 |
| Florida | 27 | 16 | Utah | 4 | 1 |
| Georgia | 14 | 9 | Virginia | 11 | 6 |
| Illinois | 18 | 4 | Washington | 10 | 4 |
| Indiana | 9 | 5 | Wisconsin | 8 | 3 |
| Iowa | 4 | 2 | Total | 435 | 189 |

**Exhibit 3**

## Pennsylvania District 17

